927 F.2d 756
 59 USLW 2575, 13 Employee Benefits Ca 1577
 B.E. TILLEY; David H. Wall; William L. Crotts, Jr.;
Chrisley H. Reed; J.C. Weddle; William D. Goode,
Plaintiffs-Appellants,
v.
The MEAD CORPORATION, Defendant-Appellee,
American Association of Retired Persons; American Society
of Pension Actuaries; Pension Benefit Guaranty
Corp.; American Academy of Actuaries,
Amici Curiae.
 No. 86-3858.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 5, 1990.
Decided Feb. 26, 1991.
As Amended June 3, 1991.
 
 George B. Driesen, argued, Washington, D.C. (R. Louis Harrison, Jr., Radford & Wandrei, Bedford, Va., Cliff Harrison, Stone, Hamrick, Harrison & Turk, Radford, Va., on brief), for plaintiffs-appellants.
 Patrick F. McCartan, argued, Jones, Day, Reavis & Pogue, Cleveland, Ohio (Richard H. Sayler, Leon E. Irish, Glen D. Nager, Steven T. Catlett, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Sue K. McDonnell, Judith Boyers Gee, Thompson, Hine & Flory, Dayton, Ohio, on brief), for defendant-appellee.
 Jeffrey B. Cohen, argued (Carol Conner Flowe, Gen. Counsel, Jeanne K. Beck, Deputy Gen. Counsel, on brief), Pension Ben. Guar. Corp., Washington, D.C., for amicus curiae, Pension Ben. Guar. Corp.
 Norman P. Stein, University of Alabama School of Law, Tuscaloosa, Ala., Christopher G. Mackaronis, Bell, Boyd & Lloyd, Washington, D.C., Steven S. Zaleznick, Cathy Ventrell-Monsees, Robert L. Liebross, American Ass'n of Retired Persons, Washington, D.C., on brief, for amicus curiae, American Ass'n of Retired Persons.
 Chester J. Salkind, Washington, D.C., on brief, for amicus curiae, American Soc. of Pension Actuaries.
 Gary D. Simms, Washington, D.C., on brief, for amicus curiae, American Academy of Actuaries.
 Before WIDENER, MURNAGHAN and CHAPMAN, Circuit Judges.
 MURNAGHAN, Circuit Judge:
 
 
 1
 The case involves whether funds that remain in a single-employer defined benefit pension plan may, upon termination of the plan, revert to the employer prior to satisfaction of the plan's unreduced early retirement benefits. After the Mead Corporation ("Mead") recouped funds that remained in a pension plan without paying such benefits, employees brought suit alleging that Mead had violated the Employees Retirement Income Security Act ("ERISA"). In an earlier decision, we held in favor of the employees, requiring Mead to pay the unreduced early retirement benefits. An ERISA created benefit was deemed to have arisen. However, the Supreme Court reversed us on the issue, determining that the relevant language of ERISA did not itself create benefits but only protected those benefits arising from other sources. The Supreme Court nevertheless remanded the case so that we could consider two alternate theories that might support a judgment in the employees' favor. We, therefore, proceed to consider whether either of the alternate theories requires a holding that Mead must pay to the plaintiffs the value of their unreduced early retirement benefits.
 
 I.
 
 2
 B.E. Tilley, William L. Crotts, Jr., William D. Goode, Chrisley H. Reed, and J.C. Weddle, collectively referred to as the plaintiffs or the pensioners,[1] were employees of the Lynchburg Foundry Company, which Mead had acquired in 1968 as a wholly-owned subsidiary. They were covered by the Mead Industrial Products Salaried Retirement Plan ("Plan"), which was established by Mead and funded entirely by its contributions.
 
 
 3
 The Plan offered both normal retirement benefits and early retirement benefits. Normal retirement benefits, payable at age 65, were calculated with reference to a participant's earnings and years of service. Participants became eligible for early retirement benefits at age 55. Early benefits were calculated in the same manner as normal retirement benefits, but the amount payable was discounted by five percent for each year that the participant retired prior to the normal retirement age of 65. However, if a participant had 30 years or more of credited service, then he or she could retire at age 62 and still receive the normal retirement benefits payable at age 65 without any reduction. These "unreduced" early retirement benefits provide the bone of contention in the present dispute.
 
 
 4
 In 1983, Mead sold the Foundry and terminated the Plan. Participants who were age 55 or older were paid their age 65 benefit reduced five percent for each year they were under age 65. Mead paid the "unreduced" early retirement benefits only to those employees who satisfied both the age (62) and service (30 years) requirements. Tilley, Goode, Reed, and Weddle had over 30 years of credited service but had not yet reached age 62; Crotts had 28 years of service. Each of them received from Mead the present value of his normal retirement benefit--reduced by five percent for each year the participant was under age 65. The lump sum payments they received ranged from $50,000 to $87,000. If the pensioners had received the present value of the "unreduced" early retirement benefits--which they expected to receive upon reaching age 62--each of them would have received, on average, $9,000 more. After the Plan's liabilities, as determined by Mead, were satisfied, nearly $11 million in assets remained in the Plan. Mead recouped the remainder.
 
 
 5
 The pensioners filed suit in Virginia state court alleging that Mead's failure to pay the present value of the unreduced early retirement benefits violated ERISA. Mead removed the case to the United States District Court for the Western District of Virginia. The district court granted summary judgment for Mead, holding that the plaintiffs were not entitled to the value of the "unreduced" early retirement benefits.
 
 
 6
 We reversed the judgment of the district court and held that Mead was required to compensate the plaintiffs for the unreduced early retirement benefits. Tilley v. Mead Corp., 815 F.2d 989 (4th Cir.1987). We reasoned that 29 U.S.C. Sec. 1344(a)(6), which provides for the payment of "all other benefits under the plan" upon termination, encompassed the early retirement benefits at issue. 815 F.2d at 991.
 
 
 7
 The Supreme Court reversed our decision. Mead Corp. v. Tilley, 490 U.S. 714, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989). The Supreme Court reasoned that Sec. 1344(a) merely provides for the orderly distribution of plan assets to satisfy benefits that have already been earned under either the Plan or ERISA. It does not create additional benefit entitlements. 109 S.Ct. at 2163. In other words, Sec. 1344(a) has a limited function; it is only an allocation mechanism.
 
 
 8
 But, significantly, the Supreme Court declined to rule on the two other theories advanced by the pensioners in support of their position: (1) that the unreduced early retirement benefits qualify as "accrued benefits," which vested upon termination of the Plan; and (2) that the unreduced early retirement benefits are "contingent rights or liabilities," which under ERISA must be satisfied prior to an employer's recoupment of surplus assets. 109 S.Ct. at 2164. Because we had not reached those issues in our original opinion, the Supreme Court remanded the case so that we could consider them.
 
 
 9
 Justice Stevens wrote the sole dissent in the case. He agreed that the Fourth Circuit erred in interpreting Sec. 1344(a)(6) as the source of the pensioners' rights to recover the unreduced early retirement benefits. Id. at 2164. But he thought that the Court should have considered the plaintiffs' other two arguments instead of remanding the case back to the Fourth Circuit. He concluded that our decision should have been affirmed because he considered the benefits at issue to be "contingent liabilities." Id. at 2165. The dissent thus was confined to a protest of the Court's failure to address the other two arguments and the expression of a proposed resolution as to one of them not considered by any other member of the Court.
 
 
 10
 On remand from the Supreme Court, the pensioners advance the two theories which the Supreme Court declined to consider. They argue that the unreduced early retirement benefits are "accrued benefits" under ERISA. They also contend that the benefits are "contingent rights or liabilities," which should have been paid prior to Mead's recoupment of the surplus assets.
 
 II.
 
 11
 Under Sec. 411 of the Internal Revenue Code, enacted by Title II of ERISA, Pub.L. No. 93-406, 88 Stat. 901 (1974) (codified as amended at 26 U.S.C. Sec. 411), "accrued benefits" become "nonforfeitable" (vested) upon termination of a qualified pension plan. Code Sec. 411(d)(3). If the unreduced early retirement benefits at issue here are "accrued benefits," then the pensioners had a vested right to those benefits upon plan termination. An analysis of the statutory scheme convinces us, however, that the unreduced early retirement benefits should not be considered "accrued benefits" within the meaning of ERISA.
 
 
 12
 Section 411(a)(7) defines the "accrued benefit" as
 
 
 13
 the employee's accrued benefit determined under the plan and ... expressed in the form of an annual benefit commencing at normal retirement age.
 
 
 14
 26 U.S.C. Sec. 411(a)(7); see also 29 U.S.C. Sec. 1002(23) (same definition of "accrued benefit"). The language of the definition seems to consider only the annual benefits that begin at normal retirement age as "accrued benefits." The definition does not mention the unreduced early retirement benefits that companies, such as Mead, offer to veteran employees in addition to the normal retirement package.
 
 
 15
 The House Report that accompanied the House version of the bill ultimately enacted as ERISA contains the following:
 
 
 16
 The term "accrued benefit" refers to pension or retirement benefits and is not intended to apply to certain ancillary benefits, such as medical insurance or life insurance, which are sometimes provided for employees in conjunction with a pension plan, and are sometimes provided separately.... Also, the accrued benefit to which the vesting rules apply is not to include such items as the value of the right to receive benefits commencing at an age before normal retirement age, or so-called social security supplements....
 
 
 17
 H.R.Rep. No. 807, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4670, 4726 (emphasis added). The Conference Report, accompanying the final version of the bill, seems to echo the understanding that early retirement benefits were not to be considered accrued benefits:
 
 
 18
 Also, the accrued benefit does not include the value of the right to receive early retirement benefits, or the value of the social security supplements or other benefits under the plan which are not continued for any employee after he has attained normal retirement age.
 
 
 19
 H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 5038, 5054. Nothing in the legislative history supports the pensioners' argument that early retirement benefits are "accrued benefits."
 
 
 20
 The IRS has promulgated a regulation that accords with the understanding that early retirement benefits are not "accrued benefits" under the statute:
 
 
 21
 In general, the term "accrued benefits" refers only to pension or retirement benefits.... For purposes of this paragraph a subsidized early retirement benefit which is provided by a plan is not taken into account....
 
 
 22
 Treas.Reg. Sec. 1.411(a)-(7)(a)(1)(ii) (1989).
 
 
 23
 Indeed, we have previously held that unreduced early retirement benefits are not "accrued benefits." In Sutton v. Weirton Steel Div'n of Nat'l Steel Corp., 724 F.2d 406 (4th Cir.1983), cert. denied, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984), employees sued National Steel, claiming that the company's modification of their pension benefits violated ERISA. Id. at 409. Although National Steel had guaranteed the payment of the employees' normal retirement benefits in an agreement to sell the division, it had not provided for the payment of the plan's early retirement benefits, which were unfunded and only payable in the event of a plant shut-down. Id. We held that the early retirement benefits at issue were not "accrued benefits," and therefore, the company's modification did not violate ERISA. "Any right to payment of benefits before normal retirement age must be found in pertinent employment agreements." Id. at 410.
 
 
 24
 The pensioners, however, cite our opinion in Collins v. Seafarers Pension Trust, 846 F.2d 936 (4th Cir.1988), for the proposition that the early retirement benefits at issue here were accrued benefits. In that case, employees had sued a multiemployer pension plan, claiming that an amendment to the plan had violated ERISA by excluding past service credits from the calculation of "early normal pension" eligibility. Id. at 937. We reversed the district court's grant of the defendants' summary judgment motion, concluding that procedural noncompliance had invalidated the amendment. In doing so, we agreed with the district court that "the right to receive a pension for past service is an accrued benefit even before actual retirement." Id. at 938. We did not decide, however, that unreduced early retirement benefits are accrued benefits under ERISA. To the extent that the district court opinion in the case, 641 F.Supp. 293 (D.Md.1986), which was reversed on other grounds, can be read to support such a rule, we reject it as inconsistent with the language and legislative history of ERISA as well as Sutton. Rather, we hold that the unreduced early retirement benefits at issue here are not "accrued benefits" within the meaning of ERISA. See Bencivenga v. Western Pa. Teamsters & Employers Pension Fund, 763 F.2d 574, 580 (3d Cir.1985). But see Amato v. Western Union Int'l, 773 F.2d 1402, 1414 (2d Cir.1985), cert. dismissed, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986).
 
 III.
 
 25
 We thus are brought to the question of whether the unreduced early retirement benefits at issue are "contingent liabilities" that must be satisfied prior to reversion of the Plan's surplus assets to Mead. In harmony with Justice Stevens,[2] we conclude that the terms of the Plan itself, as enforced by ERISA, only permit reversion of the surplus assets after Mead has paid the pensioners the value of the unreduced early retirement benefits. Accordingly, we have no need formally to adjudicate the issue, beset with problems, of whether, in the absence of such terms in the Plan, the provisions of ERISA would still require payment of the benefits here.A.
 
 
 26
 Both parties, along with four groups participating as amici curiae, have brought forth a mishmash of statutory provisions, regulations, legislative history, and actuarial lore in an attempt to persuade us that ERISA does, or does not, include the unreduced early retirement benefits as "liabilities" of the Plan. 29 U.S.C. Sec. 1344(d)(1) provides that funds may be recouped by an employer only if "all liabilities of the plan to participants and their beneficiaries have been satisfied." Similarly, Sec. 401(a)(2) of the Code requires qualified pension plans to satisfy "all liabilities" before surplus assets may revert to the employer. The pensioners contend that "liabilities" includes "contingent liabilities" and that the unreduced early retirement benefits are contingent liabilities. In that vein, the pensioners point to a Treasury regulation that interprets Sec. 401 of the Code as including both fixed and contingent liabilities. See Treas.Reg. Sec. 1-401-2(b)(2) (1989). They also roll out the legislative history of Code Sec. 401 to demonstrate that the original understanding of Congress was that only the surplus resulting from actuarial computational error was revertible, thereby mandating the satisfaction of the unreduced early retirement benefits--for which funds had been set aside. See S.Rep. No. 1567, 75th Cong., 3d Sess. 24 (1938).
 
 
 27
 Mead, however, argues that the unreduced early retirement benefits were not liabilities because no obligation to pay the benefits arose until the employees satisfied both the age and service requirements. Mead also contends that ERISA's notion of liabilities includes only "accrued benefits" under ERISA. See supra Part II. They assert that the longstanding administrative practice of the Pension Benefit Guaranty Corporation ("PBGC") and the Internal Revenue Service has been not to treat the unreduced early retirement benefits as liabilities that must be satisfied prior to asset reversion. The PBGC, as amicus curiae, argues in support of Mead's position. Both the American Society of Actuaries and the American Academy of Actuaries have submitted amicus curiae briefs, arguing that the actuarial profession's understanding of ERISA has always been that unearned early retirement benefits are not "liabilities of the plan."[3]
 
 
 28
 We find it unnecessary to resolve the apparent conflict between current practice and legislative and regulatory history because we conclude that the terms of the Plan itself, as enforced by ERISA, compel payment of the unreduced early retirement benefits to the pensioners.[4]
 
 B.
 
 29
 Section 1344(d)(1) provides that the residual assets in a single-employer pension plan may be recouped only if "the plan provides for such a distribution in these circumstances." 29 U.S.C. Sec. 1344(d)(1). Article XIII, Sec. 4(f) of the Plan provides that in the case of discontinuance of the Plan:
 
 
 30
 Any surplus remaining in the Retirement Fund, due to actuarial error, after the satisfaction of all benefit rights or contingent rights accrued under the Plan (including any benefits accrued under any Pre-existing Plan), and after distribution of any released reserves as above provided, shall, subject to the pertinent provisions of federal or state law, be returnable to [Mead].
 
 
 31
 Id. (emphasis added). Thus the Plan itself only allows recoupment of surplus funds that result from "actuarial error," and then only after the satisfaction of all "contingent rights accrued under the Plan." We conclude that reversion of the Plan's surplus funds to Mead is only permissible after satisfaction of the pensioners' unreduced early retirement benefit rights because: (1) the funds in the Plan that had been set-aside in expectation of fulfilling the unreduced early retirement benefits did not remain in the Plan "due to actuarial error"; and (2) the benefits at issue are "contingent rights" that must be paid prior to any reversion.
 
 
 32
 Mead contributed to the Plan in expectation of having to satisfy the unreduced early retirement benefits. When the Plan was terminated, only those employees who had satisfied both the age and service requirements were paid. The employees who, with reason, expected to receive the unreduced early retirement benefits in the future, such as the plaintiffs here, were not paid. The funds that had been set aside in expectation of paying those benefits were recouped by Mead. That surplus, which remained in the Plan only because the value of the unreduced early retirement benefits were not paid, was not "due to actuarial error."
 
 
 33
 "Actuarial error" seems to reference computational error resulting from inaccurate statistical assumptions. If the Plan's actuary had used precise statistical assumptions regarding the future value of Plan assets and the requirements of its beneficiaries, the Plan would have still contained a surplus on termination--the amount contributed in expectation of satisfying the pensioners' unreduced early retirement benefits, which Mead later decided not to pay.
 
 
 34
 Mead argues that the contributions made to the Fund in expectation of paying the benefits at issue did constitute actuarial error because the actuaries could not have foreseen termination of the plan or nonpayment of the unreduced benefits. But if "actuarial error" means the cause of whatever remains in the Plan when a class of benefits, reasonably expected by participants and funded all the time the Plan is in operation, is terminated, then the phrase contributes no meaning to the contractual provision and is utterly redundant.[5] More importantly, used in such a way, the word "actuarial" is rendered unnecessary. We interpret "actuarial error," as used in Article XIII of the Plan, so as not to mean the error of correctly calculating the contribution to a fund in expectation of paying a benefit that the company later decides to cancel.
 
 
 35
 Furthermore, we think that Mead was obligated to pay the unreduced early retirement benefits because the Plan mandated the satisfaction of "contingent rights accrued under the Plan." The unreduced early retirement benefits were "contingent rights" because the Plan was liable to pay them on a contingency, i.e., the plaintiffs' satisfaction of the age and service requirements. "Contingent" means nothing less. In the lay world, it is defined as "likely but not certain to happen." Webster's New Collegiate Dictionary 243 (1981). Black's Law Dictionary defines "contingent liability" as a liability "which is not now fixed and absolute, but which will become so in the case of the occurrence of some future and uncertain event." Black's Law Dictionary 291 (5th ed. 1979). In the ERISA world, the concept of "contingent" is used in a similar fashion:[I]f 1,000 employees are covered by a trust forming part of a pension plan, 300 of whom have satisfied all the requirements for a monthly pension, while the remaining 700 employees have not yet completed the required period of service, contingent obligations to such 700 employees have nevertheless arisen which constitute "liabilities"....
 
 
 36
 Treas.Reg. Sec. 1.401-2(b)(2) (1989) (emphasis added). The terms of the Plan were written in light of the regulation, which was first promulgated in 1943--long before establishment of the Plan, and conform to the plain meaning of the word "contingent." The plaintiffs would have had a fixed right, a vested right, upon reaching age 62, to the unreduced early retirement benefits. At times before the attainment of age 62 that right still existed though future and uncertain. Therefore, the plaintiffs' rights in the unreduced early retirement benefits were "contingent," as the word is commonly used and as it is specifically used under ERISA.
 
 
 37
 Mead argues, however, that the Plan requires satisfaction of "contingent rights accrued under the Plan," and that the unreduced benefits were not accrued under the Plan, because the employees had not satisfied the conditions for the benefit rights they seek--the age and service requirements. But requiring the employees to have satisfied the conditions for the benefit, making it vest, would make a nullity of the concept of contingent rights, which are protected by the terms of the Plan.
 
 
 38
 Mead might have also argued that "contingent rights accrued" refers to the technical ERISA concept of "accrued benefits," and that because the unreduced early retirement benefits should not be deemed accrued benefits under the statute (see supra Part II), they need not be satisfied prior to the reversion of surplus assets. All in all, such an interpretation would require a tremendous leap of faith. The Plan incorporates no such reference to Code Sec. 411(a)(7)'s concept of "accrued benefit," nor does the Plan manifest an intent to effect such an incorporation.
 
 
 39
 Furthermore, such an incorporation would make little sense. Upon termination of a single-employer defined benefit plan, all accrued benefits vest. "Post-termination contingent 'accrued benefits' " is an oxymoron. If we were to conclude that the Plan's protection is coterminous with the scope of ERISA, the word "contingent," as used in the Plan, would become devoid of any meaning. Rather, Sec. 4(f)'s protection of "contingent rights" leads us to conclude that Mead must pay the value of those pension benefits for which it would otherwise have become liable "but for" its termination of the Plan. Because Mead's termination of the Plan was what prevented the pensioners from satisfying the conditions so that the unreduced early retirement benefits could vest, the terms of the Plan allow the surplus funds to revert to Mead only after the unreduced early retirement benefits are satisfied.
 
 
 40
 Indeed, Justice Stevens, the only Supreme Court justice to reach the issue, also considered the early retirement benefits to be "contingent rights." He noted that the pensioners "have far more than an expectancy interest in early retirement benefits." 109 S.Ct. at 2165. "Their right to payment is contingent only upon their election to retire after reaching age 62." Id.[6] Justice Stevens also noted that the pensioners' rights were frustrated entirely by the unilateral actions of Mead. Finally, he recognized that Mead was required, both by IRS rulings and prudent actuarial practice, to accumulate the funds necessary to pay the early retirement benefits at issue. Id.
 
 
 41
 In interpreting the provisions of the Plan, we recognize that ERISA's central policy goals are to protect the interests of employees and to guard against the termination of retirement benefits for which employees have been working. See 29 U.S.C. Sec. 1001; Shaw v. Delta Air Lines, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). We hold that the Plan's provisions compel satisfaction of the unreduced retirement benefits prior to reversion of the surplus assets.
 
 
 42
 We reverse the decision of the district court and remand for further proceedings consistent with this opinion.[7]
 
 
 43
 REVERSED.
 
 WIDENER, Circuit Judge, concurring:
 
 44
 I concur in the result and in all of the majority opinion. I add only that I especially believe that the rights involved in this case are "contingent rights accrued under the Plan." Maj. op. p. 762. See also the first page of Justice Stevens' dissenting opinion in the opinion of the Supreme Court in case 490 U.S. 714, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989).
 
 CHAPMAN, Circuit Judge, dissenting:
 
 45
 I dissent from Section III of the majority opinion for two reasons. First, I believe that unreduced early retirement benefits are not "liabilities" within the meaning of Sec. 4044(d)(1)(A). Second, I believe that the language of Mead's Plan itself does not require the payment of unreduced early retirement benefits upon termination of the Plan. Therefore, I would find that the plaintiffs are not entitled to unreduced early retirement benefits from Mead.
 
 
 46
 * Initially, I feel that the majority disregards the complete instructions given by the Supreme Court. What the Court said is worth repeating:
 
 
 47
 Respondents [Plaintiffs], however, offer two alternative grounds for concluding that ERISA requires payment of unreduced early retirement benefits before surplus assets revert to the employer: first, unreduced early retirement benefits may qualify as "accrued benefits" under ERISA; and, second, unreduced early retirement benefits may be "liabilities" within the meaning of Sec. 4044(d)(1)(A), 29 U.S.C. Sec. 1344(d)(1)(A). Because the court of appeals concluded that Sec. 4044(a)(6) was a source of entitlement for unaccrued benefits, it did not reach these questions. We therefore remand for a determination whether respondents [plaintiffs] are entitled to damages on the basis of either of these alternative theories.
 
 
 48
 Mead Corp. v. Tilley, 490 U.S. 714, 109 S.Ct. 2156, 2164, 104 L.Ed.2d 796 (1989). Although the majority duly undertakes to resolve the first issue presented by the Court, the majority declines to grapple with the complexities of the second issue, as the Court had requested. Consequently, instead of analyzing the meaning of "liabilities" under Sec. 4044(d)(1)(A), the majority investigates whether "the plan provides for such distribution in these circumstances" under Sec. 4044(d)(1)(C), and holds that it does.
 
 
 49
 I feel that the majority brushes aside the Supreme Court's quite explicit language requiring this court to ascertain the meaning of "liabilities" under Sec. 4044(d)(1)(A). The Court has held consistently that "an inferior court has no power or authority to deviate from the mandate issued by an appellate court." Briggs v. Pennsylvania R.R. Co., 334 U.S. 304, 306, 68 S.Ct. 1039, 1040, 92 L.Ed. 1403 (1948). See also 5B C.J.S. Appeal & Error Sec. 1966 (1955) ("On the remand of the cause after appeal, it is the duty of the lower court to comply with the mandate of the appellate court and to obey the directions therein, without variation and without departure from the mandate of the appellate court.").
 
 
 50
 In this case, the majority deviates from the Court's mandate when it finds it "unnecessary" to resolve an issue that the Court clearly wanted to be addressed, having called it a "complicated and important issue[ ] pertaining to the private pensions of millions of workers." Mead Corp., 109 S.Ct. at 2164 n. 11. Indeed, the Court felt the issue important enough that it hesitated to plunge forward "[w]ithout the views of agencies responsible for enforcing ERISA or an opinion by the Court of Appeals." Id. (emphasis added). By failing to express an opinion on this issue, the majority discards the views submitted by the amici curiae and ultimately delays the development of the law.
 
 
 51
 However, I think that the majority may address the terms of the plan under Sec. 4044(d)(1)(C), because "[w]hile a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 168, 59 S.Ct. 777, 781, 83 L.Ed. 1184 (1939). Indeed, if the majority had held that unreduced early retirement benefits were "liabilities," then it would have been obliged to address the other two requirements of Sec. 4044(d)(1) which an employer must meet before recouping surplus funds. Consequently, I shall address both the issue remanded by the Court and the issue dealt with by the majority.
 
 II
 
 52
 Section 4044(d)(1)(A) of ERISA states that "any residual assets of a single-employer plan may be distributed to the employer if ... all liabilities of the plan to participants and heir beneficiaries have been satisfied." 29 U.S.C. Sec. 1344(d)(1)(A). The issue on remand is whether unreduced early retirement benefits are "liabilities of the plan," thereby requiring Mead, upon the termination of its Plan, to distribute any residual assets to the plaintiffs, who had satisfied some but not all of the requirements for entitlement to such benefits. I do not find that unreduced early retirement benefits are "liabilities" for two reasons. First, it appears that this term, which is not defined in ERISA, does not itself create any liabilities for benefits; such liabilities are created elsewhere in ERISA. Second, even if one looks to the analogous and better-defined use of the term "liabilities" in 26 U.S.C. Sec. 401(a)(2) of the Internal Revenue Code (Code), "liabilities" clearly encompasses only "accrued benefits," which, Section II of the majority opinion says, unreduced early retirement benefits are not.
 
 
 53
 A. The Meaning of "Liabilities" under ERISA.
 
 
 54
 The plaintiffs' contention--that unreduced early retirement benefits are "liabilities"--turns on the assumption that the word "liabilities" in Sec. 4044(d)(1)(A) has a substantive meaning of its own. The assertion is belied by several facts. First, the only source of liabilities under ERISA is the accrual and vesting provisions outlined in Title I, which sets forth an elaborate framework to determine an employee's right to benefits. See 29 U.S.C. Secs. 1053-1054. But Sec. 4044 is part of Title IV, which provides for insurance for benefits created elsewhere. Thus, Sec. 4044 simply establishes, as its title indicates, a mechanism for the "[a]llocation of assets," not the creation of liabilities. Moreover, neither ERISA nor its legislative history define the meaning of "liabilities." If Congress meant for the term to create substantive rights in addition to those found elsewhere in ERISA, Congress doubtlessly would have attempted to breathe some meaning into it.
 
 
 55
 This conclusion follows directly from the Supreme Court's opinion in this case. The Court addressed the issue whether unreduced early retirement benefits must be distributed before an employer can recoup any residual plan assets under Sec. 4044(a)(6), which states that
 
 
 56
 [i]n the case of the termination of a single-employer plan, the plan administrator shall allocate the assets of the plan (available to provide benefits) among the participants and beneficiaries of the plan in the following order:
 
 
 57
 ....
 
 
 58
 (6) Sixth, to all other benefits under the plan.
 
 
 59
 29 U.S.C. Sec. 1344(a)(6). Holding that Sec. 4044(a) is "a distribution mechanism and not a source for new entitlements," the Court explained that
 
 
 60
 [s]ection 4044(a) in no way indicates an intent to confer a right upon plan participants to recover unaccrued benefits. On the contrary, the language of Sec. 4044(a)(6)--"benefits under the plan"--can refer only to the allocation of benefits provided by the terms of the terminated plan.
 
 
 61
 Mead Corp., 109 S.Ct. at 2162 (emphasis in original). The Court thought it "inconceivable that [Sec. 4044(a) ] was designed to modify the carefully crafted provisions of Title I," which expressly creates rights to benefits. Id. I believe that the Court's analysis of Sec. 4044(a) is equally applicable to Sec. 4044(d)(1)(A) and supports the view that the term "liabilities" does not create a right to any benefits, especially unreduced early retirement benefits.
 
 
 62
 B. The Meaning of "Liabilities" under the Code.
 
 
 63
 The parties urge this court to look to the similar language and restrictions imposed by Sec. 401(a)(2) of the Code. This section states that a pension constitutes a "qualified trust" entitled to special tax treatment
 
 
 64
 if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be ... used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries.
 
 
 65
 26 U.S.C. Sec. 401(a)(2) (emphasis added). We agree with the parties that the meaning of "liabilities" under the Sec. 401(a)(2) of the Code and under Sec. 4044(d)(1)(A) of ERISA is the same, making it quite appropriate to ascertain the scope of liabilities under the Code as construed by the Internal Revenue Service (IRS) and the courts. However, the parties dispute whether liabilities under Sec. 401(a)(2) of the Code includes unreduced early retirement benefits, and I would hold that it does not.
 
 
 66
 In Treas.Reg. Sec. 1.401-2(b), the IRS gives two insights into the meaning of "liabilities" in Sec. 401(a)(2).[1] First, the regulation states that "[t]he term 'liabilities' as used in section 401(a)(2) includes both fixed and contingent obligations to employees." Treas.Reg. Sec. 1.401-2(b)(2) (1960).[2] Accord Rev.Rul. 85-6, 1985-1 C.B. 133, 144. Fixed liabilities, the IRS has further explained, "are the benefits payable to those who have become entitled to them." Rev.Rul. 53-33, 1953-1 C.B. 267, 273. It is manifest that the unreduced early retirement benefits at stake here are not fixed, because none of the plaintiffs had satisfied the Plan's prerequisite that one reach the age of 62. However, contingent liabilities "are the benefit credits accrued up to the time of termination of the trust for employees (and their beneficiaries) who might have become entitled to benefits if the trust had been continued indefinitely." Id. (emphasis added). Accord Rev.Rul. 57-163, 1957-1 C.B. 128, 138; Rev.Rul. 61-157, 1961-2 C.B. 67, 79; Rev.Rul. 65-178, 1965-2 C.B. 94, 110; Rev.Rul. 69-421, 1969-2 C.B. 59, 69; Rev.Rul. 71-152, 1971-1 C.B. 126; I.R.S. Pub. No. 778, pt. 3(d) (February 1972).
 
 
 67
 Under the Code, then, this issue depends on whether plaintiffs' unreduced early retirement benefits had "accrued" at the time the Plan was terminated. Section II of the majority opinion has already answered this question in the negative. Analyzing the language, legislative history, and regulatory interpretation of "accrued benefits" as defined by Sec. 411(a)(7) of the Code and Sec. 3(23) of ERISA, the majority held that the unreduced early retirement benefits are not "accrued benefits" under the Code and ERISA. Therefore, "liabilities" under the Code and ERISA does not include unaccrued benefits such as unreduced early retirement benefits. This analysis is fully consistent with my belief, expressed above, that in order to ascertain the scope of "liabilities" under ERISA, it is ultimately necessary to look at the substantive rights created by the vesting and accrual provisions of the statute, as well as the terms of the pertinent plan. See May v. Houston Post Pension Plan, 898 F.2d 1068 (5th Cir.1990); and Blessitt v. Retirement Plan for Employees of Dixie Engine Co., 848 F.2d 1164 (11th Cir.1988).
 
 
 68
 The plaintiffs contend that the "liabilities" that the employer must satisfy before recoupment only excludes those funds remaining "due to erroneous actuarial computation," citing the other reference to "liabilities" in Treas.Reg. Sec. 1.401-2(b):
 
 
 69
 The intent and purpose in section 401(a)(2) of the phrase "prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust" is to permit the employer to reserve the right to recover at the termination of the trust, and only at such termination, any balance remaining in the trust which is due to erroneous actuarial computations during the previous life of the trust.
 
 
 70
 Treas.Reg. Sec. 1.401-2(b)(1). See also S.Rep. No. 1567, 75th Cong., 3d Sess. 24 (1938). From this, the plaintiffs reason as follows: first, liabilities thus include all funds comprising correct actuarial computations; second, correct actuarial computations correlate directly with the proper measure of funding for a plan; and third, the proper measure of funding includes, according to the IRS, accounting for the effect of a plan's unreduced early retirement benefit, Rev.Rul. 78-331, 1978-2 C.B. 158 (stating that the requirement under Sec. 412(c)(3) of the Code that actuarial assumptions be reasonable might be violated if the plan ignored "the effect of a plan's subsidized early retirement benefit on the frequency of early retirement"). Therefore, the plaintiffs conclude that liabilities include whatever the employer funds under its plan.
 
 
 71
 The plaintiffs' logic is seductively simple but fatally flawed. The mere fact that an employer has funded a future benefit based on actuarial assumptions does not mean that an employer has assumed a liability with respect to any particular employee who may become entitled to the benefit. In funding a plan, an employer attempts, with the assistance of an actuary, to make certain that in the aggregate there will be sufficient assets to meet all benefit claims as they arise in the future. The employer does not fund benefits on a present liability basis; no specific assets are set aside for or may be claimed by any employee. An employer incurs a liability and an employee becomes entitled to accumulated funds only when the conditions for receiving a given benefit are met, and no earlier. To link benefits with funding, as the plaintiffs urge, would transform Mead's plan from a defined benefit plan, in which benefits are based typically on a formula taking into account the employee's employment service and compensation, into a defined contribution plan, in which benefits are based on the amounts contributed and invested. See Nobers v. Crucible Inc. 1975 Salaried Retirement Plan, No. 88-1237, slip op. at 7-8 (W.D.Pa. June 21, 1990).
 
 
 72
 Reflecting this reality, the IRS has adopted a broad construction of the term "erroneous actuarial computation," explaining in Treas.Reg. Sec. 1.401-2(b)(1) that
 
 
 73
 [a] balance due to an "erroneous actuarial computation" is the surplus arising because actual requirements differ from the expected requirements even though the latter were based upon previous actuarial valuations of liabilities or determinations of costs of providing pension benefits under the plan and were made by a person competent to make such determinations in accordance with reasonable assumptions as to mortality, interest, etc., and correct procedures relating to the method of funding.
 
 
 74
 An "erroneous actuarial computation" is not a narrow, technical term; it does not simply refer to a statistical error made at the time of the funding of a plan. This is because an "erroneous actuarial computation" may exist even if the actuarial valuations are made by a "competent" actuary using "reasonable assumptions" and "correct procedures."
 
 
 75
 Instead, the term "erroneous actuarial computation" is simply short-hand for what is left over after all vested and contingent obligations created in the plan are satisfied. This is plainly evident from the hypothetical used by the IRS in Sec. 1.401-2(b)(1):
 
 
 76
 For example, a trust has accumulated assets of $1,000,000 at the time of liquidation, determined by acceptable actuarial procedures using reasonable assumptions as to interest, mortality, etc., as being necessary to provide the benefits in accordance with the provisions of the plan. Upon such liquidation it is found that $950,000 will satisfy all of the liabilities under the plan. The surplus of $50,000 arises, therefore, because of the difference between the amounts actuarially determined and the amounts actually required to satisfy the liabilities. This $50,000, therefore, is the amount which may be returned to the employer as the result of an erroneous actuarial computation.
 
 
 77
 In other words, whatever remains after the satisfaction of "all of the liabilities under the plan" is the result of an "erroneous actuarial computation."[3] Therefore, I would find that the term "erroneous actuarial computation" does not impose any substantive limitation on what an employer can recoup. Such limitations are found in the benefit and accrual provisions of ERISA as well as in the terms of the plan itself.[4]
 
 
 78
 This is the only coherent and defensible way to construe Sec. 401 of the Code. Giving an independent meaning to the term "erroneous actuarial computation" could produce unwieldy results. For example, if a plan had $10 million in plan assets and only $8 million in vested and contingent rights to benefits upon its termination, and if only $1 million of the remaining $2 million is attributable to "erroneous actuarial computation," using a literal construction of the term, who has what right to the $1 million in pension assets that are not claimed as vested or contingent rights and are not the result of an "erroneous actuarial computation"? Neither ERISA or the Code gives us an answer, most likely because neither intended the term "erroneous actuarial computation" to be interpreted in this literal way, but instead intended that the phrase be interpreted and understood as set forth in the above hypothetical used by IRS.
 
 
 79
 C. The Enactment of the Retirement Equity Act of 1984.
 
 
 80
 The enactment of the Retirement Equity Act of 1984 (REA) confirms that unreduced early retirement benefits were not liabilities under ERISA before the REA was passed. Section 301(a) of the REA amended Sec. 204(g) of ERISA, 29 U.S.C. Sec. 1054(g), and Sec. 411(d)(6) of the Code, to require that terminating plans treat early retirement benefits as if they were accrued benefits in some circumstances, thereby making any reduction in such benefits prohibited. Specifically, Sec. 301(a) of the REA requires payment of "retirement-type subsid[ies] ... to a participant who satisfies (either before or after [a plan termination] the pre-[termination] conditions for the subsidy." 29 U.S.C. Sec. 1054(g)(2). See also 26 U.S.C. Sec. 411(d)(6)(B). In other words, an employee has the right to meet the conditions specified in the plan for retirement-type subsidies by continued service with the employer after plan termination. The amount of the subsidy, however, is limited to "benefits attributed to service before" the termination of the plan. Id. Thus, the REA only requires payment of benefits accrued at the time of the termination of the plan, and not of benefits that might have accrued subsequently. See Rev.Rul. 86-48, 1986-1 C.B. 216, 217; Rev.Rul. 85-6, 1985-1 C.B. 133, 134.
 
 
 81
 If the plaintiffs are correct--that ERISA requires the payment of unreduced early retirement benefits upon a plan's termination, then the REA is redundant to the extent that it now requires such benefits and creates a contingent liability for them. The majority is not convinced by this argument and suggests that the REA "might have been enacted to remove all doubt where there previously had been uncertainty as to what was meant" under ERISA before the REA. I disagree for several reasons. First, the legislative history indicates that Congress thought it was creating a new benefit under ERISA and the Code. See 130 Cong.Rec. H4251 (daily ed. May 22, 1984) (statement of Rep. Erlenborn) (stating that early version of the REA, which did not make retirement-type subsidies accrued benefits, did not "change the definition of accrued benefit so as to in any way affect benefits payable under a terminated plan."); and 130 Cong.Rec. H8763 (daily ed. Aug. 9, 1984) (statement of Rep. Roukema) (stating that section 301(a) of the REA, as finally passed, is a "change from present law" that "means that for sufficient plans, depending on the circumstances, some or all of the plan assets that would otherwise revert to the employer will now have to be allocated to participant benefits.").
 
 
 82
 Second, the IRS apparently believes that the REA changed prior law. In Rev.Rul. 85-6, 1985-1 C.B. 133, 134, the IRS "consider[ed] Rev.Rul. 83-52, 1983-1 C.B. 87, in light of the enactment of section 301" of the REA, and decided to "modif[y] and superced[e]" the Revenue Ruling's implications for retirement-type subsidies. The IRS concluded that the Code now required an employer to pay "a participant who satisfies (either before or after the [the termination of the plan], the pre-[termination] conditions for the subsidy." Id. As a result, the IRS offered several ways for an employer to meet the vesting requirements in Sec. 411 of the Code and thereby be able to recover the surplus.
 
 
 83
 Finally, it is clear that the REA does not in any way support plaintiffs' claims under ERISA insofar as they go beyond what the REA requires in two respects. The plaintiffs claim a right to unreduced early retirement benefits, even though they can not satisfy the conditions specified in the plan, and they seek the value of the subsidy not only for pre-termination service but also for post-termination service. If this theory is correct, then the REA actually reduced the protection given to retirement-type subsidies at termination, because the REA mandates the subsidy only for those employees who actually satisfy the conditions of the plan, and then only based on pre-termination service. This is an unlikely scenario, and for these reasons, I do not believe that the REA simply removed any doubt as to the meaning of ERISA. Instead, the REA created new rights not found under prior law.[5]
 
 III
 
 84
 The majority bases its holding on Sec. 4044(d)(1)(C) of ERISA, which states that the residual assets in a single-employer pension plan may be recouped if "the plan provides for such a distribution in these circumstances." 29 U.S.C. Sec. 1344(d)(1)(C). Article XIII, Sec. 4(f) of the Plan provides:
 
 
 85
 Any surplus remaining in the Retirement Fund, due to actuarial error, after the satisfaction of all benefit rights or contingent rights accrued under the Plan ... shall, subject to the pertinent provisions of federal or state law, be returnable to the respective Employing Company as determined by the Administrative Committee.
 
 
 86
 (emphasis added). The majority interprets this provision to allow recoupment of surplus funds only if two conditions are satisfied: (1) if the surplus funds resulted from "actuarial error;" and (2) after the satisfaction of all "benefit rights or contingent rights accrued under the Plan." The majority concludes that Mead fulfilled neither condition and is therefore not entitled to recoup the surplus. I disagree.
 
 
 87
 As to the first condition found by the majority, I believe that the majority misconstrues the import of the term "actuarial error." In finding that this term "seems to reference computational error from inaccurate statistical assumptions," the majority analyzes this term in a vacuum, deliberately ignoring the term's obvious origins in Treas.Reg. Sec. 1.401-2(b). It seems self-evident that the term "actuarial error" is coterminous with the term "erroneous actuarial computation," especially given the interchangeable use of the two terms by the IRS in Treas.Reg. Sec. 1.401-2(b) and Rev.Rul. 83-52, 1983-1 C.B. 87. As a result, the IRS's interpretation of the concept is highly relevant to, if not dispositive of, any analysis of the Plan.[6] As discussed above, I believe that the term "erroneous actuarial computation" simply means whatever is left over after all vested and contingent obligations are satisfied, unless the surplus is the result of an amendment to the benefit or eligibility provisions of a plan. Applying that definition to the Plan, it is clear that the surplus funds at stake here are the result of "actuarial error" as that term has been defined by IRS and is applicable to the present facts.
 
 
 88
 As to the second condition, the majority's interpretation of "contingent rights accrued" suffers from the same tunnel-visioned reasoning as its view of "actuarial error." The words comprising the term "contingent rights accrued" have ample meaning under both ERISA and the Code, and the courts should look to these meanings. Such reliance is justified by the fact that the Plan itself apparently invokes ERISA and the Code by using these words, an invocation that the majority concedes by noting that "[t]he terms of the Plan were written in light of the regulation," i.e., Treas.Reg. Sec. 1.401-2(b). The Plan's intent to borrow the definitions of "contingent" and "accrued" (as well as "actuarial error") is bolstered by the Plan's total failure to define these terms.
 
 
 89
 Accordingly, there is no doubt that each of the plaintiffs' rights to unreduced early retirement benefits are contingent on attaining the age of 62. But it is apparent that these rights did not accrue in the manner that normal retirement benefits did, as Section II of the majority's opinion explains. As a result, the plaintiffs' rights to contingent early retirement benefits had not yet accrued under the Plan. Therefore, I believe that Mead satisfied both conditions set in the Plan and is entitled to recoup the residual assets.
 
 
 90
 But the majority bypasses ERISA and the Code, declining to apply what it felt was "the technical ERISA concept of 'accrued benefits.' " Instead, the majority claims that a "post-termination contingent 'accrued benefit' " is an "oxymoron" and proceeds to disregard the word "accrued" in order to make sense of the Plan. Such a construction of the Plan is clearly improper when ERISA and the Code, and their regulations, make feasible an interpretation that gives meaning to each and every word in the Plan. For just as a court, "[i]n construing a statute ... [is] obliged to give effect, if possible, to every word Congress used," Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); see also Thurner Heat Treating Corp. v. N.L.R.B., 839 F.2d 1256, 1259 (7th Cir.1988), so must a court interpret the language of a contract, such as the Plan here.
 
 
 91
 For the above reasons, which I believe are in keeping with the mandate of the Supreme Court, I dissent from Section III of the majority's opinion.
 
 
 
 [1]
 A sixth plaintiff, David H. Wall, died while the action was pending in the district court. The Supreme Court denied a motion to substitute his executor
 
 
 [2]
 The other eight Justices did not reject the theory of Justice Stevens' dissent. Rather they did not resolve, but left to another day, the issue presented
 
 
 [3]
 Another complication is the Retirement Equity Act of 1984, Pub.L. No. 98-397, 98 Stat. 1426 ("REA"), which amended ERISA, effective July 30, 1984, to require that pension plans treat early retirement benefits as if they were "accrued benefits" in some instances. See 29 U.S.C. Sec. 1054(g)(2). The present case is governed by pre-REA law; the requirements added by REA are inapplicable. But Mead and the PBGC argue that holding early retirement benefits to be accrued benefits would render REA an unnecessary enactment. They conclude that the enactment of REA sheds light on what ERISA's use of "liabilities" means and that Congress did not think "liabilities" included unreduced early retirement benefits or else it would not have passed some of the provisions of REA. Yet the legislation might have been enacted to remove all doubt where there previously had been uncertainty as to what was meant
 
 
 [4]
 The dissent's position that our opinion disregards the Supreme Court's mandate is incorrect. The Court directed us to consider on remand whether the pensioners are entitled to payment of their unreduced early retirement benefits under either of their alternative theories: (1) that the benefits are accrued benefits under ERISA; and (2) that the benefits are liabilities of the plan under 29 U.S.C. Sec. 1344(d)(1)(A). We reject the first theory. Nevertheless, we accept the second theory, that the benefits are liabilities of the plan, because we hold, consistent with Justice Stevens' position, that the language of the plan itself compels payment of the benefits. Whether ERISA would compel payment of the benefits in the absence of such language in the plan is a question that is unnecessary to answer and one whose answer has not been compelled by the Supreme Court
 
 
 [5]
 It drastically stretches plain meaning to hold that calculations and set asides, correct when made, later, retroactively, became actuarial computation errors when termination made recoupment to the employer possible
 
 
 [6]
 For four of the five plaintiffs, the expectancy has endured and matured into a reliance for more than 30 years
 
 
 [7]
 We deny the appellee's pending motion for leave to file a revised statutory appendix as it is unnecessary in light of the availability of the materials the revised appendix includes
 
 
 [1]
 We note that there is a strong presumption in favor of the validity of Treasury Regulations. See Bob Jones University v. United States, 461 U.S. 574, 596, 103 S.Ct. 2017, 2030, 76 L.Ed.2d 157 (1983). Indeed, the Supreme Court urged this court on remand to "consider the views of the PBGC [Pension Benefit Guaranty Corporation] and the IRS," explaining that "[f]or a court to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to 'embar[k] upon a voyage without a compass.' " Mead Corp., 109 S.Ct. at 2164 (quoting Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980))
 
 
 [2]
 While Treas.Reg. Sec. 1.401-2 predates ERISA, it is applied to post-ERISA plans under Treas.Reg. Sec. 1.401(a)-2. See Blessitt v. Retirement Plan for Employees of Dixie Engine Co., 848 F.2d 1164, 1170 n. 15 (11th Cir.1988)
 
 
 [3]
 The IRS subsequently reiterated this framework:
 Section 1.401-2(b)(2) provides that liabilities that must be satisfied include both fixed ... and contingent ... liabilities. After satisfaction of those liabilities, an employer may recover any remaining funds from the plan as surplus resulting from actuarial error.
 ....
 For purposes of section 1.401-2(b)(2), the valuation of benefits as permitted under Title IV may be used in determining whether there is any surplus due to an actuarial error. Therefore, after cash distributions have been made to the participants in this plan in amounts equal to the present value ... of their total benefits, any remaining assets (i.e. those resulting from actuarial error) may revert to the employer without causing a violation of the non-diversion rule of section 1.401-2 of the regulations.
 Similarly, when fixed and contingent liabilities are discharged through the purchase of a contract or contracts from an insurance company which provides the benefits with respect to individuals for whom the liabilities are determined, the remaining assets may be considered surplus arising from actuarial error and revert to the employer.
 Rev.Rul. 83-52, 1983-1 C.B. 87, 87 (emphasis added).
 
 
 [4]
 The plaintiffs point out that any surplus resulting from "a change in the benefit provisions or in the eligibility requirements of the plan ... could not revert to the employer because such surplus would not be the result of an erroneous actuarial computation." Treas.Reg. Sec. 1.401-2(b)(1). But the plaintiffs assume incorrectly that a termination of a plan is the same thing as a change in a plan's benefit or eligibility provisions. It is not, as shown by the explicit distinction in Treas. Reg. Sec. 1.401-2(b)(1) between a liquidation of a plan, in which anything left over is the result of an "erroneous actuarial computation," and a change in the plan, in which any surplus caused by the change is not the result of an "erroneous actuarial computation." To hold otherwise would mean that an employer could not terminate a plan without paying all employees the benefits that they might have earned under the plan if it had continued indefinitely. However, this verges on the creation of a "benefit expectations" theory, of which the IRS and courts have disapproved. Gen.Couns. Mem. 39,665 (Sept. 25, 1987), IRS Positions (CCH) p 1971; Blessitt v. Retirement Plan for Employees of Dixie Engine Co., 848 F.2d 1164, 1173 & n. 20 (11th Cir.1988)
 
 
 [5]
 In finding that unreduced early retirement benefits are not "liabilities" under ERISA and the Code, I do not endorse the Pension Benefit Guaranty Corporation's (PBGC) traditional position insofar as it holds that "liabilities" in Sec. 4044(d)(1)(A) is coextensive with the benefits included in the six priority categories in Sec. 4044(a), and that therefore the scope of liabilities is determined by reference to the benefits allocated according to Sec. 4044(a). See 29 C.F.R. Sec. 2618.3, .13, . 14, & .15; 40 Fed.Reg. 51,368-51,370 (1975); and 46 Fed.Reg. 49,842-49,843 (1981). The Supreme Court's ruling in this case expressly held that Sec. 4044(a) is solely an allocation scheme and does not give rise to benefit entitlements
 However, I ultimately rely on the PBGC's position that neither Sec. 4044(d)(1) of ERISA nor Sec. 401(a)(2) of the Code by themselves create liabilities for benefits. The only source of liabilities are the accrual and vesting provisions of Title I of ERISA and Sec. 411 of the Code, the benefits required by Sec. 401(a)(11) of the Code, and the terms of the plan itself.
 
 
 [6]
 This is the same approach taken by the Sixth Circuit in International Union, United Auto. and Agric. Implement Workers of America v. Dyneer Corp., 747 F.2d 335, 337 (6th Cir.1984), where the Sixth Circuit, interpreting a plan that used the term "actuarial error," upheld the adoption of the IRS's definition of "actuarial error" in Rev. Rul. 83-52, 1983-1 C.B. 87. See also Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Co., 555 F.Supp. 257 (D.D.C.1983), aff'd, 729 F.2d 863 (D.C.Cir.1984); In re Moyer Co. Trust Fund, 441 F.Supp. 1128 (E.D.Pa.1977), aff'd, 582 F.2d 1273 (3d Cir.1978). See, generally, 60A Am.Jur.2d Sec. 950 at 619 & n. 29 (1988) ("A court may properly adopt the IRS definition of "actuarial error" to interpret the plan provision.")