**Robert F. FULLER and Ripley R. Click, Plaintiffs,**

v.

**FMC CORP. TERMINATED VESTED AND RETIRED SALARIED EMPLOYEES' RETIREMENT PLAN, FMC Corp. Severance Pay Plan, FMC Corporation, W. Ronald Cooper, V.H. Hare, Patrick J. Head, L.P. Holleran, W.J. Kirby, and R.J. Woods, members of the Review Panel of the Employee Welfare benefits Committee, and AGRI–Tech, Inc., Defendants.**

Civ. A. No. 90–0145–H.

United States District Court, W.D. Virginia, Harrisonburg Division.

Memorandum Opinion & Final Order May 26, 1992.

As Amended June 10, 1992.

John B. Mann, Levitt & Mann, Richmond, Va., Stephen R. Bruce, Washington, D.C., for plaintiffs.

Paul J. Neal, Jr., Woodstock, Va., Brian J. Brake, Hunton & Williams, Richmond, Va., for defendants.

## MEMORANDUM OPINION

CRIGLER, United States Magistrate Judge.

This action is before the court on the cross motions for summary judgment filed by the plaintiffs on the one hand and the FMC Defendants (defendants), on the other.[1] On March 25, 1992, the court entertained argument by the parties. For the reasons set forth below, summary judgment will enter as follows: a) in favor of the plaintiffs and against the FMC Defendants, except the individual members of the Review Panel, on all plaintiffs' claims related to severance pay under Counts I and II and to pension benefits under Count IV; b) in favor of the plaintiffs and against the FMC defendants, except the Review Panel, on all claims asserted in Counts VII and VIII; c) in favor of the individual members of the Review Panel on plaintiffs' claims in Counts I and II; d) in favor of all the FMC Defendants, including the Review Panel, on plaintiffs' claim for pension benefits under Counts III, V and VI; and e) in favor of Agri–Tech, Inc. on all of plaintiffs' claims set forth in the amended complaint.

## I.  FACTS[2]

Ripley R. Click and Robert Fuller (sometimes referred to as plaintiffs or Click or Fuller) began work for FMC in 1960 and 1966, respectively, in one of FMC's divisional plants in Woodstock, Virginia. On September 30, 1985, FMC sold the facility where plaintiffs worked to Robert A. Coffelt[3] and Agri–Tech, Inc., a company formed by Coffelt to purchase the FMC facility. By this time, Fuller was Manager of Dealer Sales and Click was District Sales Manager.

The evidence shows that corporate decisions related to the discontinuation of operations at the Woodstock facility had been in the making at FMC since the middle of 1984 despite the fact that FMC had issued at least one bulletin advising the employees that the Woodstock facility was not one of its operations that was targeted for divestiture. (Exh. 35)[4]. In any event, an asset purchase agreement between FMC, as seller, and Agri–Tech and Coffelt, as purchasers, was executed September 6, 1985. (Exh. 10). This agreement was subject to certain other terms and conditions agreed upon by the parties to the sale under letter agreement dated September 5, 1985 and executed by Coffelt and Agri–Tech on September 9, 1985. (Exh. 7). The letter

---

1. All defendants except Agri–Tech, Inc. hereby are considered to be FMC Defendants.

2. At the hearing on the motions, the parties could not point to any genuine issues of material fact which they believe are in dispute. Instead, they suggested that there were none, but offered to resolve any material factual disputes discovered by the court in its review of the record. The court, having examined the record thoroughly, does not believe that there are any genuine issues of material fact. All remaining disputes concern issues of law.

3. Robert Coffelt was the former manager for FMC of the Woodstock facility.

4. Unless otherwise stated all references to exhibits will be to the documents received by the court on March 12, 1992 and denominated as EXHIBITS 1–34 AS IDENTIFIED IN DEPOSITIONS OF ROBERT COFFELT, RIPLEY CLICK, ROBERT FULLER, RONALD COOPER, KEN J. MORRISSEY AND L.H. HOLLERAN together with EXHIBITS 35–50 filed as attachments to the AFFIDAVIT OF ROBERT F. FULLER, the AFFIDAVIT OF RIPLEY R. CLICK and the DECLARATION OF STEPHEN R. BRUCE, respectively.

agreement appears to have: a) required Agri–Tech to offer employment to "all" FMCs employees at "comparable levels of compensation"; b) provided that FMC would retain all liability for "its" employees "up to the Closing Date" under its hourly and salary pension benefits plans "applicable to the Business"; and c) obligated Agri–Tech to indemnify and hold FMC harmless against all claims for severance pay that might be brought by carry-over employees who might be terminated or laid off, other than for cause, by Agri–Tech.

On September 30, 1985, FMC ceased its operations at Woodstock. Before the end of business that day, the sale of its assets to Agri–Tech and Coffelt was closed. No matter how one wishes to characterize the situation, it is clear from the record in this case that, effective with the close of business on September 30, 1985, neither plaintiff any longer was working for FMC. It also is undisputed that at no time before or after the sale did FMC offer plaintiffs employment at any other facility it owned or operated.

On October 1, 1985, Agri–Tech commenced its operations in the same location. It was plaintiffs' understanding that unless they refused, they "would become Agri–Tech employees beginning October 1, 1985." (Plaintiff's Memorandum in Support of Motion for Summary Judgment at 4). In fact, plaintiffs did become employees of Agri–Tech on October 1, 1985 and worked for that company until November 1, 1989 when Agri–Tech terminated plaintiffs' employment without cause as the result of a business reorganization.

According to the plaintiffs, and not denied by defendants, plaintiffs were told by a representative of FMC in October, 1985 that FMC was not paying severance pay. They were not advised by this or any other FMC representative, however, about any option available to them that would entitle them to severance pay either from FMC or Agri–Tech. Both plaintiffs disagreed with FMC's position regarding severance pay and expected severance pay from FMC.

At the time it ceased operations in Woodstock, FMC had in effect its Independent Plant Wage Policy (Policy Guide) which, in part, pertained to employees' rights to severance pay. (Exh. 13). On April 28, 1986, well after the sale of the Woodstock facility to Agri–Tech, FMC group managers and directors were advised that FMC had revised its severance pay policies. (APPENDIX TO FMC DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT) (Defendants' Appendix, Tab 11). This revision eventually was confirmed in a 1987 summary description, published by FMC and distributed to its employees, addressing employee rights to "Other Compensation." (Exh. 20). Neither plaintiff was made aware of this revision, nor were they made aware of any other revision to the severance policy which they contend was effective in 1985 at the time FMC ceased its Woodstock operations.

In late 1985 and early 1986 plaintiffs, with the aid of legal counsel, began to pursue claims they believed they had against FMC for vacation and severance pay. Eventually, they were successful in securing accrued vacation pay from Agri–Tech, but both FMC and Agri–Tech continued to deny responsibility for severance pay resulting from the September 1985 transaction. FMC appears to have taken the position that severance pay was not then currently due, and that any liability for it lay on Agri–Tech, which had "assumed" the obligation to pay severance benefits. When Agri–Tech terminated the plaintiffs in 1989, demands again were made for severance pay, but both FMC and Agri–Tech once more refused to pay the plaintiffs.

Fuller and Click also believed that FMC had a retirement plan going back at least to 1977. (See, e.g. Affidavit of Ripley R. Click (Click Affidavit), 3–11–92, at p. 4). In fact, the FMC Salaried Employees Retirement Plan was effective January, 1976. For purposes of this action, it apparently was revised twice. (Exhibits 2 and 5). The effect of the last amendment will be discussed below. In any event, neither plaintiff ever was provided a copy of the Plan

itself. (Exh. 2). Instead, plan summaries (Summary Plan Descriptions or SPDs) were furnished employees by FMC. (Exh. 1 and 28). The last SPD provided to the plaintiffs before the 1985 transaction between FMC and Agri–Tech was issued in 1984. (Exh. 1). Plaintiffs received no other SPDs showing any subsequent revisions of the Plan, though the evidence shows there were several revisions made before this action was instituted. The Plan was terminated by FMC on November 30, 1985, in preparation for settling contingent liabilities before reverting assets to the company. (Exh. 27).

The parties do not dispute, and counsel for the FMC defendants admitted during argument before this court, that the plaintiffs ended their relationship with FMC with vested rights to retirement benefits under the Plan.[5] The parties contest only the extent of those benefits. In that regard, the original Plan divides benefits into three principle categories: a) "Regular Retirement Benefits" (Section 6); b) "Early Retirement Benefits" (Section 7); and c) "Other Termination Benefits" (Section 9). (Exh. 2). The first two categories address participants who elect retirement. (Exh. 2, Sections 6 and 7). The latter addresses entitlement to a " 'Termination Benefit' " for participants who "cease to be an Employee before age 55 for any reason other than death ...". (Exh. 2, Section 9) (emphasis added). While Section 7(c) clearly sets forth a reduction of retirement benefits by 4% per year for each year benefits payments precede age . 62, Section 9 requires a 6% reduction for a participant who "ceases to be an Employee before age 55 for any reason other than death" with vested benefits.

The 1984 SPD also addressed and made a distinction between "normal" and "early"

retirement benefits. (Exh. 1, at F00172 and F00175). These provisions concededly parallel Sections 6 and 7 of the Plan. However, in terms which plaintiffs suggest are inadequate notice of FMC's interpretation of the Plan and which FMC contends are entirely consistent with Section 9 of the Plan, the 1984 SPD advised the reader of benefits available "*If You Leave FMC* Before Age 55". (Exh. 1, at F00178, emphasis added).[6] Such benefits were to be reduced at a rate of 6% per year. Despite FMC's assertion that it intended the SPD to advise the participants of the provisions of Section 9 of the Plan, it is clear that the actual language used in the SPD, i.e. "If you leave," differs from that used in Section 9 of the Plan, which provided reduced benefits for a participant "who ceases to be an Employee." Whether the language was adequate to have conveyed the meaning FMC intended will be addressed below.

On March 1, 1985, *before* the transaction with Agri–Tech, the Plan's Committee amended Section 9(b) of the Plan. (Exh. 5). In essence the amendment gave the benefit of the 4% early retirement pension reduction to a plan participant who had attained age 40 and "ceases" to be an employee because of a plant shutdown or divestiture but excepted from such benefit any participants who "is employed by a successor employer." (*Id.*) There is no dispute that notice of this change was not communicated to the Woodstock employees or to any other employees until after the divestiture to Agri–Tech, though FMC had an opportunity to do so. The record shows that even after the transaction with Agri–Tech, as late as October 1 and 7, 1985, FMC representatives visited the Agri–Tech plant to discuss so-called "options" available for the former FMC personnel, but no mention was made of the amendments to the Plan.[7]

---

5. This concession by FMC is important. It weakens FMC's argument that under the 1984 SPD statement of "Situations That Could Affect Plan Benefits", plaintiffs were not covered by the Plan when they elected retirement because they did not "retire from the company". (Exh. 1 at F00188). While they were not employed by FMC at the time of their retirement, there is no question, as FMC admits, plaintiffs "terminate[d] with a vested benefit". (*Id.*).

6. The 1984 SPD defines "Termination" as "If you leave FMC with vested benefits before you reach age 55 ...". (Exh. 1 at F00162).

7. It is interesting to the court that even when FMC announced its intent to restructure the retirement Plan and to revert assets, it assured the participant that the restructuring "will not affect your retirement benefit. You will be eligible to receive the same retirement benefit you

In late 1985 and early 1986, plaintiffs were advised by FMC that if they should elect retirement after age 55 but began drawing benefits before age 62, their respective retirement benefits would be reduced by 4% per year. (See, e.g. Exh. 17). By August, 1986, however, FMC disavowed its earlier statements to plaintiffs regarding the calculation of benefits under the 4% reduction formula and advised that such calculation was "in error." (Exh. 4 and 18). Instead, FMC determined that the 6% reduction was to apply "for employees who *terminate* from FMC before age 55 *and* whose termination is not the result of an FMC plant shutdown". (*Id.*) (emphasis added).

There is no dispute that plaintiff did not become aware of the changes in the Plan or in FMC's interpretation of the Plan as such pertain to the 4% and the 6% benefit reduction *before* their employment with FMC ceased, and that they ceased work with FMC with vested rights. It equally is undisputed that plaintiffs did not know of these changes in FMC's interpretation of the policy and in the policy itself under circumstances where they meaningfully could have negotiated for benefits with Agri–Tech or entered the market to purchase coverage for that which FMC now claims was not part of plaintiffs' vested benefits.

## II.   DISCUSSION, FINDINGS AND CONCLUSIONS

### A.   SEVERANCE PAY

Both sides agree that under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the court should review *de novo* the denial of severance pay benefits. Distilled, *Bruch* stands for the proposition that absent contractual provisions to the contrary, the actions of administrators of a severance plan or policy are to be reviewed *de novo* by the courts.

Plaintiffs contend they are entitled to prevail on their severance claim because defendants' application of an implied exception to deny benefits to employees who commenced working for the purchaser corporation violated the terms of the severance policy itself. Even if the plan allowed for such exception, plaintiffs suggest the administrators of the severance plan breached their fiduciary duty to plaintiffs by failing to disclose or give proper notice of this implied exception before the divestiture was effectuated or within such reasonable time as to permit plaintiffs an opportunity to exercise any true "option" in light of the job action. In essence, plaintiffs believe that under the terms of the severance policy that was operative in September, 1985, they, in fact, were terminated effective with the divestiture of the plant facility and are entitled to severance pay because of that specific job action. They contend that any attempt by FMC to justify its failure to pay severance either by reliance upon practices employed in other divisions based on other severance plans or by applying an interpretation of the plan never properly disclosed to plaintiffs before the transaction with Agri–Tech should not be accepted by the court particularly where, as here, Agri–Tech, in turn, had no severance plan to protect them from loss by later termination.

Plaintiffs cite *Dulany Foods, Inc. v. Ayers*, 220 Va. 502, 260 S.E.2d 196 (1979) for the proposition that under state law, an employee is terminated for severance pay purposes irrespective of whether he is employed immediately by another employer. They also rely upon *Ulmer v. Harsco Corp.*, 884 F.2d 98 (3rd Cir.1989) and *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir.), *cert. denied* 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985) to support their contention that an offer of "continuing employment" by another employer, absent terms in the plan permitting it, does not allow the employer to avoid its severance pay responsibilities. Lastly, plaintiffs rely on *Blau* and *Rodriguez v. MEBA Pension Trust*, 872 F.2d 69 (4th Cir.), *cert. denied*, 493 U.S. 872, 110 S.Ct. 202, 107 L.Ed.2d 155 (1989) to suggest that FMC's failure to disclose it's interpretation of the severance

are now entitled to or will be entitled to in the

future." (Exh. 32).

plan not only confirms that this so-called exception never was embraced in the applicable severance plan, but that to implement such exception after the fact constituted a violation of defendants' fiduciary obligation under ERISA.

FMC disagrees and claims that plaintiffs never were "laid off" employees in the first instance, and that they never were terminated because they continued their jobs with the new employer without any interruption in work for several years after the divestiture. Relying on *Sejman v. Warner–Lambert Company*, 889 F.2d 1346 (4th Cir.1989) (*Sejman II*); *Jung v. FMC Corporation*, 755 F.2d 708 (9th Cir.1985) and *Holland v. Burlington Industries, Inc*, 772 F.2d 1140 (4th Cir.1985), *aff'd sub nom. Brooks v. Burlington Industries, Inc.*, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986), FMC claims that the severance plan effectuated FMC's intent only to mitigate the effects of loss of employment which might result from circumstances beyond the employee's control. Since there was no true loss of employment because of plaintiffs' being hired by Agri–Tech, and since the plaintiffs never were "laid off" in the first instance, they should not be allowed to recover severance benefits in this action.

FMC also argues that plaintiffs should not be able to recover solely because they later were terminated by Agri–Tech, a company which did not have a severance plan. It contends that plaintiffs were not "terminated" under its policy in the first instance. In addition, under *Sejman II*, FMC contends that it was free to amend the severance plan at any time, and that by the time plaintiffs were let go by Agri–Tech, its policy provided for no benefit in the event of divestiture where employment was continued by the successor company.

Lastly, FMC denies a breach of any fiduciary duty to the plaintiffs because of alleged failures to disclose that FMC would decline severance pay to any employee offered employment at Agri–Tech.[8] Alterna-

tively, FMC seems to assert that if severance is recoverable, it must be paid by Agri–Tech under the letter agreement which was made part of the asset sale in September 1985. (Exh. 6).

In reaching a result in this action, the court not only must be mindful of what the authorities cited by the parties actually say, but it also must be cognizant of the circumstances in which those cases were decided. The reason for such circumspection is two-fold. First, the review standard employed in this Circuit before *Bruch* was an "arbitrary and capricious" standard. 772 F.2d at 1148. Second, though clearly recognizing an employer's right to amend or eliminate severance benefits, and while giving its imprimatur to policy provisions eliminating benefits to employees who are terminated by one employer but provided an opportunity to continue substantially similar employment with a successor or acquiring company, the Fourth Circuit clearly has signalled that application of those principles are fact specific. According to the *Sejman II* majority, where the contract is silent, the "[c]ourts should hesitate to impose upon companies unwritten contractual liabilities". 889 F.2d 1346, 1350. Believing that this court equally should hesitate to impose unwritten contractual exclusions upon the employees, it will not craft the elimination of benefits into a policy where the exclusion did not exist in the first place or where to apply such exclusion defeats the clear meaning of those portions of the policy that properly had been disclosed to the employees. Accordingly, while the court recognizes that the Fourth Circuit cases relied upon by FMC in support of its defenses to the severance pay claims, particularly *Sejman*, are binding decisional authority, their application to the case at bar does not necessarily compel the results reached in them either because a different review standard applies here or because the facts in this case are distinguishable from those cases on which FMC relies. Therefore, some analysis of *Sejman II* and its predecessors is required.

---

**8.** FMC consistently has taken the position that the offer of continued employment with a successor company triggered its release from any obligation for severance pay irrespective of whether the employee accepted continued employment.

In *Livernois v. Warner–Lambert Company, Inc.*, 723 F.2d 1148 (4th Cir.1983), the court addressed claims for severance pay based upon a merger of one of Warner–Lambert's divisions into Parke–Davis. Warner–Lambert had maintained a severance policy which provided benefits to employees terminated by the company because of job elimination, work performance or company convenience. Interestingly, Warner–Lambert remained obligated to "assure" severance and other benefits offered by Parke–Davis to the former Warner–Lambert employees. The merger unravelled, but some of the employees, including the plaintiff, Livernois, were given contracts of employment in order to induce their remaining with the company and were promised by Warner–Lambert that if a sale eventually occurred, reasonable efforts would be made to secure their continued employment with a purchaser. Warner–Lambert then negotiated a sale of the division to another company, PMP. This company apparently hired not only the employees, like Livernois, who had an agreement with Warner–Lambert, but also those who did not have such an agreement. The contract between Warner–Lambert and PMP provided for comparable benefits, and it expressly denied third party beneficiary status to employees. Plaintiffs sued, claiming termination from Warner–Lambert and entitlement to severance pay.

The court first observed that there is no "job elimination," thus no termination, unless the nature of the employment with a successor company is "markedly different and less favorable, from the employees' point of view, than that [compensation and benefits package] in force when the predecessor was their employer ..." 723 F.2d at 1152. This definition of termination is important because in crafting it, Judge Murnaghan, writing for the court, gave lower courts a workable federal law definition of termination. Furthermore, Judge Murnaghan made clear that the fact that an employee inherits a new and "untested employer, without the same assurances of a stable and continued future" is not enough, without more, to find that such new employment constitutes constructive job elimination of, or termination from, the former employment. *Id.* at 1153.

Despite fashioning these guideposts, the *Livernois* court was forced to face the discrete facts in the case before it. Finding that either Warner–Lambert or PMP or both remained liable for job severance to employees who continued with PMP, thus securing the availability of severance pay to the plaintiffs in the event of a termination by PMP, and fearing that under the formulas for severance pay agreed to between Warner–Lambert and PMP the plaintiffs otherwise would be entitled to "double dip," the appellate court reversed the district court's award of severance pay. It remanded the case for the entry of judgment in favor of the employer.[9]

*Sejman II* was decided some six years later. It was originally brought by other employees of Warner–Lambert, and it sought severance pay arising out of the same transaction that originally was addressed in *Livernois*. This time some of the plaintiffs claimed job elimination or termination as a result of PMP's reducing the benefits originally inherited in the 1981 transaction with Warner–Lambert. Others claimed entitlement to severance benefits from Warner–Lambert because they actually had been terminated from PMP's employ. In sustaining the denial of plaintiffs' claims, a divided Court of Appeals held that once PMP took over the management of the company, "its severance policy, and not that of Warner–Lambert, was controlling," that no job elimination occurred upon amendment of the policy by PMP, and that the plaintiffs who were terminated by PMP, under the former policy, could not hold Warner–Lambert liable because they no longer were employees of Warner–Lambert. In addition, the court recognized the employer's responsibility to provide adequate disclosure of changes under 29 U.S.C. §§ 1021–1031, holding that those re-

---

9. The court in *Livernois* made clear that Warner–Lambert's day of reckoning yet was to come because it was "ultimately liable" to the plaintiffs in the event of a termination that triggered benefits. *Id.* at 1157.

quirements either were met or were not sufficiently flagrant or substantive to require the results reached in *Blau.*

The Hon. K.K. Hall dissented in part because he believed the majority and the district court below failed to account for certain findings in *Livernois* which bound Warner–Lambert to provide severance benefits even though such liability might have been postponed until job elimination by PMP.[10] He concurred, however, in the determination that adjustment of benefits by PMP was not "job elimination" under ERISA.

When read in conjunction, these three cases seem to set forth several consistent applicable principles where the benefits policy has not specifically provided otherwise. First, there is no job elimination or termination under ERISA where there is continuing employment by a successor company in a divestiture unless the compensation package with that successor, from an employees' point of view, is markedly different and less favorable than the package in force before divestiture. The financial stability of the "new" employer is not a factor, at least where there is some substantial period after the divestiture during which the employees work for the successor company.[11] Second, an employer unilaterally may amend or eliminate contingent and unaccrued prospective severance benefits. The amendment to the policy may be by the original employer, if its policy is in effect, or the successor company, or both, even where the successor has agreed with the original employer to continue employee benefits plans. Third, any attempt to amend or eliminate benefits must meet ERISA's disclosure and notice

requirements, and any failure to meet those requirements must either be flagrant or work a substantive harm on the employees.

These same observations address many contentions of the parties, including FMC's argument that the court ought to adopt the company's long-standing interpretation of the severance policy irrespective of the circumstances in this case because, *inter alia,* the Ninth Circuit approved it in *Jung.* Again, the court notes that the facts concerning the policy in effect at the time of the job action in *Jung* were quite different from those before the court. Furthermore, the Ninth Circuit conducted its review of the company's action under the arbitrary and capricious standard emphasizing that where more than one construction of a policy is reasonable, then an employer's choice of one of those cannot be arbitrary and capricious. 755 F.2d at 712–713.

Turning to the facts, the court finds that severance pay in this case is governed by the Independent Plant Wage Policy, and that plaintiffs never received notification of any changes in that policy or in FMC's interpretation of the policy before the transaction with Agri–Tech. Those changes were substantive and substantial. Though it appears that FMC's interpretation of the severance policy as well as the modifications it attempted had their genesis in its victory in *Jung,* FMC did not effectively modify the terms of that policy until after the transaction with Agri–Tech.

The court further finds that the nature of the employment benefits package with the successor company, from an employees point of view, was markedly different from

---

**10.** The court in *Sejman v. Warner–Lambert Co., Inc.,* 845 F.2d 66 (4th Cir.1988) (*Sejman I*), as Judge Hall observed, did not overrule *Livernois.* It specifically addressed whether *Holland v. Burlington Industries,* 772 F.2d 1140 (4th Cir. 1985), which applied preemption under ERISA to severance plans, affected the rule announced in *Livernois.* Judge Hall, writing for the court in *Sejman I,* clearly indicated that it did not. The court does not intend to enter any imbroglio over whether *Livernois* represents "good" law. It is constrained to observe that unless reversed, *Livernois* should be applied in the case at bar as representative of federal common law

in this Circuit on the matters before the court. If there is rebuttal to Judge Hall's majority opinion in *Sejman I* and his dissent in *Sejman II,* it can be had if this case goes before the Court of Appeals.

**11.** The court does not here need to address whether hypothetical circumstances, such as the successor's terminating the employees within several days or a few weeks after the transaction or the successor's collapse shortly after the deal is closed, would produce a different result. Those facts are not before the court.

and less favorable than the benefits package with FMC. There are several reasons for this finding. First, Agri–Tech did not have, at the time of the transaction, any severance policy. Not that Agri–Tech was required to have such under ERISA, or if it did, that it could not have eliminated such upon proper disclosure. The point is, it had no severance policy, which left prospective continuing employees without severance benefits at all if terminated by Agri–Tech and not covered by FMC.

Second, the September 5, 1985, letter agreement which FMC says shifted coverage for severance pay from FMC to Agri–Tech, and which agreement appears to convey that Agri–Tech opened in the Woodstock location with some form of severance policy, albeit by adoption of the FMC plan, does nothing of the sort. In plain English that agreement said nothing more than if Agri–Tech terminated a former FMC employee under circumstances triggering a claim for severance, it would be liable to FMC to repay any severance FMC might be required to pay to that employee. FMC, since before *Jung*, always expected to pay no severance benefit to such employees because it did not believe a termination was occurring. Therefore, this so-called hold harmless or indemnity agreement is worth little to the court, for the plaintiffs' claims are not based upon their termination by Agri–Tech. At most, the indemnity agreement represents FMC's fear, well-founded in the end, that its reliance on *Jung* might be misplaced, though the terms of the agreement themselves fail to address the exposure faced by FMC under the circumstances like those at bar.

Third, the decision by the Fourth Circuit in *Livernois* was as available to FMC as that in *Jung*. It seems to this court that if

FMC truly had desired to avoid adverse consequences to it on claims for severance pay arising out of the sale to Agri–Tech, it had several simple options. One, it could have made sure that the Woodstock employees received actual notice of the changes in its severance policy before the sale. Of course, that might have bred discontent among a body of personnel it wished to "transfer" like chattels to Agri–Tech. Second, it could have provided in the sales agreement with Agri–Tech that severance would be continued. Of course, a buyer who was as highly leveraged in the deal as was Coffelt might have balked at such a proposal.[12] Even then, it could have suggested that Agri–Tech provide truly comparable compensation benefits, but later exercise its right to alter or eliminate them after sufficient time had elapsed. Alternatively, it could have expressly retained liability for severance pay to its former employees, which FMC apparently did not desire to do.

■ It is the court's view that where, as here, a selling company has a severance plan and the acquiring company does not, unless the employees who continue with the successor are provided such a plan, then however equal the successor's compensation package is in all other respects, it is not "comparable" as that term was contemplated by the courts in *Livernois* and *Sejman I*.[13] Accordingly, the court finds that there was job elimination or termination when FMC divested its assets to Agri–Tech. That being the case, plaintiffs became terminated employees of FMC, under *Livernois*, on September 30, 1985 though they went to work for Agri–Tech on October 1, 1985. The court also finds that FMC failed to provide sufficient disclo-

---

**12.** Indeed, the fact that one so highly leveraged as Coffelt did not balk at assuming the "obligation" to indemnify FMC for severance pay which might become owed is further proof that the indemnity clause imposed little or no obligation at all. After all, Coffelt formerly was FMC's facility manager who presumably had insight to management's interpretation of the severance policy.

**13.** The *Sejman II* court, while not dwelling on the meaning of "termination", affirmed findings

that no termination had occurred where the nature of the employment was not markedly different from what had preceded it. Thus *Sejman II* did not disturb the *Livernois* definition of "termination". In both cases, there was no marked difference in employment, in part because both employers offered severance pay. *Sejman II* departs from *Livernois* over the issue of whether arrangements *between employers* imposed a continuing obligation on the selling company to pay severance.

sure of the pre-sale amendments to is policy so as to place plaintiffs on notice of the changes. Furthermore, such failures were not merely procedural violations of ERISA for they worked a substantive harm as to amount to a flagrant violation under *Blau. See also, Rodriguez v. MEBA Pension Trust,* 872 F.2d 69 (4th Cir.1989). Because the court finds plaintiffs were terminated from FMC, they were entitled to severance pay under FMC's severance policy on September 30, 1985, the date from which plaintiff always have sought such benefits.

Summary judgment will enter in favor of the plaintiffs and against FMC but in favor of Agri–Tech and against the plaintiffs on their severance pay claims.[14]

### B. PENSION BENEFITS

Plaintiffs' pension claims are diverse and facially more complicated than their severance pay claims. However, many of them will not long detain the court.

Counts III and IV of plaintiffs' amended complaint allege that FMC not only violated the terms of the pension plan in denying to plaintiffs the 4% reduction in benefits for early retirement, it also issued a misleading SPD in 1984 upon which plaintiffs both were entitled to rely and upon which FMC should be liable irrespective of what the underlying plan provided or how FMC construed the benefits payable under that plan. Count V seeks recovery of the 4% reduction of benefits based upon FMC's alleged breach of its fiduciary duty to provide proper disclosure or notice either that FMC had adopted a "plant shutdown" amendment on March 1, 1985 or that FMC was interpreting the plan to exclude the application of the 4% reduction under plaintiffs' circumstances. Plaintiffs further claim in Count VI of the amended complaint that FMC is liable to them for not utilizing the 4% reduction factor because it breached its fiduciary relationship with the plaintiffs by making promises and representations that the 4% reduction would obtain, but after the plaintiffs relied upon such to elect early retirement, FMC reneged and computed their retirement, instead, based upon a 6% reduction. Plaintiffs seek to have the court review the actions of FMC *de novo,* contending that the pension plan did not reserve discretionary authority to the fiduciaries either to determine eligibility or to construe the terms of the plan. *See Bruch,* 489 U.S. at 115, 109 S.Ct. at 956.

The FMC defendants disagree that the court should review the pension aspects of this case *de novo,* asserting that the plan expressly reserved to the fiduciaries the authority to make, *inter alia,* such rules and interpretations and to "take such other action to administer the Plan *as it may deem appropriate.*" (Exh. 2, Section 14(d) and 15(a)) (emphasis added). That being the case, FMC defendants offer: a) that they neither abused their discretion nor were they arbitrary in interpreting the Plan to apply the 6% rather than the 4% early retirement reduction; b) that the SPDs were not in conflict with the terms of the Plan itself; c) that these defendants did not breach any fiduciary duty as the result of nor are they liable to plaintiffs for issuing an incorrect benefits statement which was later corrected; and, d) that plaintiffs are not entitled to the 4% reduction because of any lack of notice regarding the March 1985 amendment to the Plan.

As to Count III, court finds the Plan to have reserved in the fiduciaries discretion to make rules and interpretations and to administer the Plan. Therefore, the court must review the defendants' actions as set forth in Count III for an abuse of discretion. On the other hand, the SPDs did not contain any provision reserving discretion in the fiduciaries regarding matters of rule making or interpretation of Plan administration. Accordingly, the court will

---

**14.** The issue of Agri–Tech's liability to FMC under the letter agreement is not before the court, and it will not be decided here. Likewise, the letter agreement, itself, provides no basis for the plaintiffs to recover, assuming they can be considered third party beneficiaries, because by its terms liability would arise *only* if FMC was required to pay because of the plaintiffs' termination from Agri–Tech. Plaintiffs' claims always have been based upon their termination *from* FMC in September, 1985, not upon any job action by Agri–Tech some years later.

not afford the same discretionary deference to FMC as to matters raised in Count IV of the amended complaint as it did with respect to its interpretation and administration of the Plan itself. Finally, the court will review whether the FMC defendants breached any fiduciary duty independently of the claims raised as a result of FMC's interpretation of the Plan document or the SPDs.

Plaintiffs cannot recover under Count III of the amended complaint, the claim which is based upon the terms and interpretation of the Plan, for several reasons. The court first observes that under the Plan itself, there were two categories of retiring participants. One was participants who were retiring from the employ of FMC. (Exh. 2, Section 7). The other was participants who had ceased working for FMC before the election to retire was made. (Exh. 2, Section 9).

While originally asserting a right to recover under the Plan itself, counsel for plaintiffs rightly conceded in oral argument that they have "no case" if Section 9 of the Plan, as amended, controls. This is so because Section 9 provides that any participant who *"ceases* to be an Employee before age 55 *for any reason other than death"* would be entitled to a termination benefit based upon a reduction factor of 6% where the former employee took early retirement and began receiving benefits before the "Participant's Normal Retirement Date." (Exh. 2, Section (a) and (b)) (emphasis added).

■ There is no question in the court's mind that plaintiffs were participants who had "ceased" employment with FMC for reasons other than death. The court concludes that defendants' interpretation of Section 9 of the Plan to call for the application of the 6% reduction factor was not an abuse of discretion. Indeed, such interpretation was entirely consistent with the plain meaning of the Plan. Therefore, any claim based upon allegations of abuse of

discretion in the interpretation of the Plan provisions must fail, and summary judgment will enter in favor of the defendants on Count III of the complaint.

Count V of the complaint also cannot be supported by the facts in the case. The court already has recognized that ERISA requires direct notice to plan participants of changes in the provisions of the plan so as to afford the participants an opportunity to take action. Plaintiffs base their claim in Count V on the failure of the fiduciaries to disclose to the plaintiffs the March 1, 1985 amendment to the Plan.

■ FMC correctly argues that it had 210 days after the end of the plan year, or until July 29, 1986 as the plan year ended with the end of the calendar year, within which to publish the amendment and still meet the disclosure requirements of ERISA. 29 U.S.C. § 1024(b)(1). The court can glean nothing from ERISA to suggest that such "bright line" date must be accelerated where divestiture is contemplated or is imminent.[15] Summary judgment will enter in favor of the defendants on Count V of the amended complaint.

■ Likewise, plaintiffs' attempts in Count VI of the amended complaint somehow to bootstrap tortious misrepresentation and estoppel theories into this case as a breach of FMC's fiduciary duty are unavailing. While FMC's own conduct in mistakenly advising the plaintiffs that the 4% reduction factor would be used in calculating their benefits might be significant evidence in the context of Count IV, in this court's judgment, it constituted neither a misrepresented promise of benefits nor a breach of FMC's fiduciary duty to the plaintiffs. In addition, the court does not believe plaintiff has demonstrated the reliance necessary to support their estoppel claim, even should estoppel be a viable theory upon which to premise a claim for breach of an ERISA fiduciary's duty to the participant. Whatever plaintiffs believed about their entitlement to a 4% reduction

---

**15.** Where an amendment is promulgated and notice thereof fails to reach the participants before either job action is taken or before the participant elects to take benefits under the pri-

or Plan, a question is raised concerning the efficacy of the amendment. The court is not required in this case to resolve such question because it is not before the court.

rather than a 6% reduction, their entitlement thereto can be premised, if at all, only upon the SPDs that had been made available to them before the transaction with Agri–Tech. This is so because the letters from FMC initially indicating that the 4% reduction would be applied did nothing more than confirm plaintiffs' understanding of their rights under the SPDs. There is no evidence before the court that plaintiffs placed any greater reliance on the letters than they did on their reading of the SPDs. Plaintiffs' efforts in this case primarily have been focused upon what they claim to have been the representations made in those summaries, nothing more, nothing less. Summary judgment will enter in favor of the defendants on Count VI of the amended complaint.

The true gravamen of plaintiffs' pension action, as the court sees it, is contained in Count IV of the amended complaint. On this count depend all of their other attempts to require the FMC defendants to apply the 4% reduction factor, and the claim has as its predicate the unchallenged fact that plaintiffs never were provided with a copy of FMC's pension plan. It is agreed that instead they were provided only with the SPDs of 1979 and 1984. (Exhibits 28 and 1, respectively).

■ ERISA requires an employer to file copies of the actual plan with the Secretary of Labor and to provide plan summaries to the participants. 29 U.S.C. § 1021(a) and (b). The Act further regulates the content of any plan summary disseminated to participants. 29 U.S.C. §§ 1024 and 1025.[16] It has been held that where the terms of a plan not provided to the participants conflict with the terms of the summary plan provided to the participants, the employer cannot rely on the plan language to contradict the plan summary. *Heidgerd v. Olin,* 906 F.2d 903, 907 (2nd Cir.1990).[17] Such conclusion appears logical to this court because it believes that

Congress contemplated that employees reasonably would expect representations set forth in a summary plan to be reliable reflections of the terms of the plan document itself, at least to the extent that such representations pertained to material issues of coverage. Accordingly, employees would be "entitled to rely on the descriptions contained in the summary" particularly where, as here, no other form of the plan document ever was offered or supplied to the plaintiffs in an effort to disseminate the plan's terms. *Id.*

In some circuits, reliance upon the SPD is not required in order to recover under its terms. *See, e.g. Edwards v. State Farm Mut. Auto Ins. Co.,* 851 F.2d 134 (6th Cir. 1988) (collecting cases). While the court does not believe that reliance is required in this circuit under the instant circumstances, reliance has been required in at least one case to show that a claimant fell within the definition of "employee" under ERISA in a forfeiture of benefits context. *Darden v. Nationwide Mut. Ins. Co.,* 922 F.2d 203, 205 (4th Cir.1990) (*Darden II*); *Darden v. Nationwide Mut. Ins. Co.,* 796 F.2d 701, 707 (4th Cir.1986) (*Darden I*). However, the requirement was met in *Darden* by a showing that the claimant remained in the employer's service for a substantial period of time and that he forewent other significant means of providing for retirement. If reliance is necessary in the context of this case, proof abounds that plaintiffs remained with FMC, as well as its successor, for a substantial period, and that they took no action to provide for their retirement by alternate means, as did the claimants in *Darden.*

There are several differences between the instant Plan document and the SPDs. The first noticeable difference is that while the Plan document reserved discretion in the fiduciaries, among others things, to interpret its terms, the SPDs did not reserve discretion in the fiduciaries to make rules

---

**16.** *See also,* 29 C.F.R. §§ 2520.102–2(b) and 2520.102–3(1).

**17.** The case at bar is factually distinguishable from *DeNobel v. Vitro Corp.,* 885 F.2d 1180 (4th Cir.1989) where the court found that the sum-

mary plan clearly provided that in case of conflicts between the summary and the plan document, the terms of the plan document controlled. The SPDs in the instant case contain no such language.

and interpretations of entitlement in the administration of benefits. Therefore, while it well may have been within FMC's discretion to interpret what the Plan meant, the court here is not construing the Plan. Rather, the court merely is examining whether the SPDs accurately convey to the employees the Plan's actual terms and the construction that FMC has placed upon those terms.

The second noticeable difference lies in the provision of benefits for persons who retired directly from FMC after age 55 and those whose employment with FMC ended before age 55. The Plan document fixed the "Normal Retirement Date" at age 65 and provided for both normal and early retirement from the company after age 55. It also fixed "Termination Benefits" for those who ceased to be employees of FMC for any reason other than death before age 55, at which age termination benefits could become payable upon election by the former employee. (Exh. 2, Sections 7 and 9). Termination benefits were calculated on a percentage of "Normal Retirement" benefits, and the Plan required that the benefits be reduced by 6% per year in the event the employee sought payment of the benefit before age 62. Section 9 of the Plan document made it plain that a participant entitled to a termination benefit was one who "ceases to be an Employee before age 55 for any reason other than death ..." (*Id.* at Section 9(a)).

Neither the 1979 nor 1984 SPD contained the precise language used by FMC in Section 9 of the Plan document to differentiate the employee entitled to termination benefits because his employment with FMC ended before age 55 from the employee who retired from the company at either the normal or early date. Both SPDs did warn that an employee would not be eligible for any benefit unless he "retire(d) from the Company, terminate(d) with a vested benefit, or ... made contributions to a prior plan." (Exh. 1 at F100188 and 28 at 00226). In addition, the SPDs made it clear that FMC expected the Plan to "continue indefinitely", though it reserved the right to "amend, modify, or terminate the Plan if necessary." (*Id.*). Nevertheless, neither

SPD made the clear-cut distinction between employees retiring directly from FMC at the normal or early date and those claiming vested benefits even though due to cessation of employment before age 55.

Instead of making the same distinction between the categories of employees and benefits set forth in Sections 7 and 9 of the Plan document, the SPDs described both retirement and termination benefits under a summary of retirement benefits. "Termination" was defined thusly: *"If you leave FMC with a vested benefit before you reach age 55 ..."* (Exh. 1 at F00162; Exh. 28 at 00200) (emphasis added). "Normal Retirement" was defined as beginning at age 65 and "Early Retirement" was defined as beginning at "anytime between the ages of 55 and 65, according to your election". (*Id.*).

The SPDs also advised the participant that in the event that he elected to take early retirement and further chose to receive benefits "before you are age 62," the retirement benefit *"will be reduced 4% each year"* that payments begin before age 62. (Exh. 1 at F00175 and 28 at 00212) (emphasis added). However, both SPDs went on to provided

*If you leave FMC before you reach age 55,* you can receive a vested benefit from the Plan if you had at least 10 years service when you terminated. Your benefit is calculated under the terms of the Plan in effect when you terminated employment.

Your benefits will begin at age 65 unless you elect otherwise.

If you elect to start receiving benefits before age 65, your pension is reduced to account for the longer period of time during which your benefits probably will be paid. The reduction is 6% for each year ... that your benefit payments begin before you are age 65.

Exh. 1 at F00178 and 28 at 00215 (emphasis added).

It is these provisions over which the parties are divided, though the court is not quite certain that they fully recognize where their division lies.

Plaintiffs do not appear to contend in Count IV, as defendants would seem to believe, that the SPDs were "misleading." While it is true that if plaintiffs' construction of the terms of the SPD prevails, those terms would be misleading in comparison to the terms of the Plan document, plaintiffs suggest that the SPDs identify the circumstances under which both the 6% and 4% reductions would obtain. They contend the "If you leave" predicate requires the *participant/employee* to take action to leave the company, in which circumstance the 6% reduction would apply. The plaintiffs assert that the SPDs reasonably lead the participant to believe that once retirement is elected, unless the employee had voluntarily left the company before age 55 with 10 years of service, he would be entitled to the 4% reduction because that was the reduction factor applied to all others who opted for "Early Retirement" under the summary plan. Neither plaintiff believes he "left" FMC, and both were over 55 years of age with 10 years of service with FMC at the time they elected to "retire."

Defendants call such a construction "patently tortured" and assert that in order to secure retirement benefits in the first instance, the participant must have retired "from the Company" (FMC Defendants' Motion For Summary Judgment at 31, referring to Exh. 1 at F00188). Since plaintiffs did not "retire from the Company," counsel for the FMC defendants argues that plaintiffs could not possibly construe the summary to give them a right to a 4% reduction factor in the event they elected to claim benefits after age 55 and payable before age 62 having been separated from the company since September 1985.[18] It takes a lawyer to make such an assertion.

In the court's view, a reasonable lay person in these circumstances would have construed the SPDs in question just as plaintiffs have construed them. If FMC had wished to have made clear to its employees what was clearly stated in Section 9 of the Plan document itself, it easily could have done so. Simply put, the SPD phrase "If you leave" does not convey the same message to an employee as the Plan document provision "ceases to be an Employee before age 55 for any reason other than death." Had FMC truly wished to have its employees know that "If you leave" meant "ceases to be an Employee ... for any reason" it simply could have taken the language directly from the Plan document and copied those words verbatim into the SPDs. FMC did not do that, and it has offered no reason for using different language. The court will not conjure up any on FMC's behalf.[19]

Furthermore, the court finds it passing strange that the FMC defendants notified plaintiffs of their entitlement to the 4% reduction, a decision FMC now claims was erroneous, yet today they argue that such a construction of the SPDs is "tortured." The only source for FMC's so-called error is the 4% reduction language found in both SPDs under consideration. The Plan document, on the other hand, clearly required the application of the 6% reduction because plaintiffs' employment with FMC, under its terms, had ceased before age 55. Therefore, even the FMC defendants, at least briefly, recognized the plain meaning of those SPDs. They, too, construed the summaries as did the plaintiffs, and their later change of heart cannot obscure that fact. When, however, that interpretation conflicted with one being developed on a company-wide basis, out went the baby with the bath water.

---

**18.** Of course, this argument ignores the fact that benefits were payable to any present or former participants whose rights had vested prior to the close of business on September 30, 1985. FMC never has denied that plaintiffs had vested rights in the Plan's benefits, only the nature and extent of those rights. *See also* n. 5 and accompanying test, *supra.*

**19.** One other matter garners the attention of the court, but it needs only passing attention. The FMC defendants have argued that the court should "look to" the cases it cites to interpret the meaning of the plan or plan summaries. Interestingly, the cases suggest that the court ought to "look to" the precise terms of the controlling document to ascertain its meaning. Furthermore, the court has found no case addressing the precise terms at issue here.

Applying the principles that the summary controls where the terms of the Plan document and the summary plan conflict, and that where, as here, the participants have not been provided with the Plan document, and concluding that the SPDs, which were the only plan-related documents ever disclosed to the plaintiffs, were drawn in a manner to have lead the reasonable participant under the circumstances to expect to receive a 4% reduction upon the election of benefits under the circumstances presented in this case, and finding that by their remaining in FMC's employ for a significant period without securing alternate or supplemental benefits, plaintiffs relied upon the SPDs for a description of their benefits, the court is of the opinion that summary judgement should enter in favor of the plaintiffs and against all FMC defendants except the individual members of the Review Panel under Count IV of the amended complaint. As to the members of the Review Panel, however, plaintiffs do not claim that the denial of benefits as set forth in Count IV also was a breach of fiduciary duty. Because plaintiffs do not seek relief against the fiduciaries in their individual capacities in this count, summary judgment will enter in favor of the individual members of the Review Panel, i.e. defendants Cooper, Hare, Head, Holleran, Kirby and Woods, and against the plaintiffs on Count IV of the amended complaint.

## C. ALLOCATION OF SURPLUS ASSETS

Counts VII and VIII seek an award to the plaintiffs of a portion of the Plan's assets reverted by FMC after termination of the Plan. They contend that FMC failed to satisfy all of its liabilities under the law, in accordance both with its own resolution causing the reversion of its assets and under ERISA. Specifically, plaintiffs assert that FMC failed to purchase an annuity for a significant period of time after the reversion, and that the annuity it purchased does not cover all the liabilities of FMC to the plaintiffs. Plaintiffs ask the court to compute the allocation of surplus assets under the formula provided by regulation. *See* 29 C.F.R. 2618.32(a).

FMC says the Plan's liabilities have been satisfied, and that plaintiffs cannot recover an allocation of assets where there has been no violation of law. As Judge Murnaghan observed in *Tilley v. Mead Corp.*, 927 F.2d 756 at 761 (4th Cir.1991), FMC has "brought forth a mishmash of statutory provisions (and) regulations ... in an attempt to persuade ..." the court to deny plaintiffs' prayer for relief. The determinative question having been decided in *Tilley*, albeit by a divided court, these claims will not long detain this court.

The plan in *Tilley* required the satisfaction of contingent liabilities before the residual assets could revert to the company. Finding that Meade had failed to do so, the *Tilley* majority entered judgement on behalf of the pensioners and remanded the case to the trial court for further proceedings. Those proceedings have not occurred as the judgment of the Fourth Circuit is pending before the Supreme Court on a petition for a writ of *certiorari*.

■■■ In the meantime, this court feels constrained to follow *Tilley* as the extant law of the Circuit. Therefore, when it looks to the Plan, as *Tilley* teaches, it is clear that the Plan's termination amendment of November 30, 1985 called for the satisfaction of both accrued benefits and contingent liabilities. (Exh. 27). Under *Tilley*, FMC's obligation to pay the differential between the 4% and the 6% reduction would be a contingent liability, while FMC's liability for severance pay would constitute liability for accrued benefits. FMC has purchased an annuity to cover the costs of all accrued benefits, including severance pay. To that extent it has satisfied the requirements of the termination amendment. Summary judgment will enter in favor of the defendants on Count VII of the amended complaint which seeks allocation of assets related to plaintiffs' severance pay claims. On the other hand, the pension reduction differential (i.e. the difference between the 6% and the 4% reduction), which under *Tilley* would be a contingent liability, was not settled before the

reversion occurred, and the evidence before the court shows that such is not covered by insurance. Summary judgment, therefore, should enter in favor of the plaintiffs and against all FMC defendants, except the individual Panel members, on Count VIII of the amended complaint.

Concluding that the formula under 29 C.F.R. § 2618.32(a)(1) and (2) should apply for purposes of calculating the amount of the allocation, and rejecting defendants argument to the contrary, the court in its final order will direct that the allocation conform with the requirements of such regulation, except that the calculation shall be made only with respect to the difference between plaintiffs' pension benefits adjusted according to the 4% reduction due them under the SPDs and the benefits that were adjusted according to the 6% reduction factor erroneously applied by the defendants.

## D. SUMMARY

For the reasons set forth in this Memorandum Opinion, the court will enter an Order as follows:

1) Summary judgment will enter in favor of the plaintiffs and against the defendants FMC Corp. and FMC Corp. Severance Pay Plan on Counts I and II; it will enter in favor of the plaintiffs and against the defendants FMC Corp. and FMC Corp. Terminated Vested and Retired Salaried Employees' Retirement Plan on Counts IV, VII and VIII.

2) Summary judgment will enter on Counts III, V and VI against the plaintiffs and in favor of all FMC defendants, including the individual members of the Review Panel, and on Counts I, II, IV, VII and VIII against the plaintiffs and in favor of the individual members of the Review Panel.

3) Summary judgment on all Counts will enter against the plaintiffs and in favor of the defendant Agri–Tech.

The final order also will direct that this action be stricken from the docket without prejudice to the plaintiffs' rights to seek an award of counsel fees.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.